UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TERESA MARTINEZ, )
)
    Plaintiff, ) 14 C 2292
)
v. ) Judge Sidney I. Schenkier
)
CAROLYN COLVIN, Acting )
Commissioner of the Social Security )
Administration, )
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Teresa Martinez filed an application for supplemental security income benefits on April 12, 2011. After her application was denied by an Administrative Law Judge and her appeal was rejected by the Appeals Council, Ms. Martinez filed suit seeking review of the final decision rejecting her claim. Plaintiff has requested a remand (doc. # 10), and defendant has filed a motion for summary judgment seeking affirmance (doc. # 20). For the reasons set forth below, the Court denies the motion for summary judgment and grants the request for remand.

### I.

In late September 1991, when she was sixteen years old, Ms. Martinez suffered a sudden, severe headache (R. 173). Doctors at the University of Chicago discovered two major problems: a subarachnoid hemorrhage (*i.e.*, aneurysm) and coarctation (*i.e.*, narrowing) of the aorta (R. 159, 167, 173). Doctors surgically repaired the aneurysm within days (R. 167-168) and surgically repaired the aorta a few months later (R. 188-190). Plaintiff experienced memory

---

[1] On September 3, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 13, 15).

problems after the surgery to repair the aneurysm. On October 10, 1991, for example, her doctor noted that plaintiff was unaware that she had had her sixteenth birthday (R. 165).

Given her memory problems, Ms. Martinez was unable to finish high school (R. 519). She got married and is raising a daughter (R. 519). During a brief period of time in the late 1990's, Ms. Martinez worked as a bill collector (R. 146, 152). She left that job either because she was laid off or because of her headaches (the record contains evidence of both reasons) (R. 45, 145, 459).

## A.

Years later, in April 2011, Ms. Martinez applied for supplemental security income on the basis of her purported disability (R. 127). In her application, Ms. Martinez stated that the onset date of her disability was January 31, 2009 (R. 127). She later amended her claimed onset date to April 12, 2011, the date of her application (R. 32). In connection with her application, Ms. Martinez filled out a function report (R. 248). In her function report, Ms. Martinez noted that her "extreme lack of short-term memory" prevents her from working, and that she also suffers "unpredictable chest pains" and migraines (R. 237, 239, 243). She also described how her medical issues affect her daily life. For example, Ms. Martinez stated that she writes on her calendar how often she washes her hair and when she needs to take her pills (R. 240). She does not handle cash, because she has trouble remembering how much money she has handed to a cashier (R. 241). She no longer uses the stove, because she forgets that she turned it on (R. 240). Instead, she prepares cold meals, such as cereal and sandwiches (R. 240). Notwithstanding her memory issues and her inability to follow verbal directions, Ms. Martinez said she can follow written directions very well, so long as she keeps them with her (R. 243). Ms. Martinez stated that her memory affects her ability to travel, because she cannot remember where she is going

2

(R. 241). For that reason, and because she is afraid of experiencing the sudden onset of a migraine or chest pain, Ms. Martinez does not drive (R. 241).

**B.**

In addition to Ms. Martinez's own descriptions of her medical issues, the record also contains evidence that Ms. Martinez has seen a variety of health-care providers in connection with her various complaints.

For chest pain, Ms. Martinez has been treated by Cesar Herrera, M.D. ("Dr. Herrera"). On September 22, 2008, Dr. Herrera noted that Ms. Martinez reported having experienced episodes of sharp chest pain that were not related to exertion (R. 436). Ms. Martinez returned to see Dr. Herrera on October 11, 2010, at which point Dr. Herrera noted that Ms. Martinez reported experiencing chest pains while moving in bed (R. 440). On January 17, 2011, Dr. Herrera conducted a stress test with Ms. Martinez (R. 424-425). Dr. Herrera noted that Ms. Martinez was able to exercise for nine minutes without chest pain (R. 425, 434). Dr. Herrera also noted that the repair of Ms. Martinez's coarctation was stable; but, because Ms. Martinez had experienced hypertension during her stress test, Dr. Herrera recommended that she begin taking 25 mg daily of metopolol (R. 425). Ms. Martinez again discussed her chest pain with Dr. Herrera at her appointment with him on May 24, 2011, at which time he prescribed Toprol (R. 539-540). On January 17, 2012, Ms. Martinez again told Dr. Herrera about her chest pain, but she noted that she had experienced some improvement since taking Toprol (R. 537).

For her memory problems and headaches, Ms. Martinez was treated by Serge Pierre-Louis, M.D. ("Dr. Pierre-Louis"), a neurologist. On March 8, 2011, Ms. Martinez attended her appointment with Dr. Pierre-Louis by herself (R. 448). Dr. Pierre-Louis prescribed Elavil (a/k/a amitriptyline) and referred Ms. Martinez to Dr. Stephen Clingerman, Ph.D. ("Dr. Clingerman")

3

for a neuropsychological evaluation (R. 448). Ms. Martinez met with Dr. Pierre-Louis again on June 30, 2011. At that time, Ms. Martinez reported to Dr. Pierre-Louis that she was still experiencing migraine headaches (R. 452). Dr. Pierre-Louis noted that Ms. Martinez had stopped taking Elavil, because she felt it was not working (R. 452, 528). Dr. Pierre-Louis encouraged Ms. Martinez to continue taking the medication and referred her for a CT scan of her head (R. 528). The CT scan uncovered a 15 millimeter by 12 millimeter meningioma (*i.e.*, tumor), but, on March 29, 2012, Dr. Pierre-Louis concluded that the tumor was not causing Ms. Martinez's symptoms (R. 510, 515). Instead, Dr. Pierre-Louis opined that Ms. Martinez's memory problems were caused by her aneurysm (R. 515). He also opined that Ms. Martinez suffered from chronic headaches, which "may be a combination of migraine variant+rebound headache+depresson," and that her symptoms may be due to depression (*Id.*).

During a July 12, 2012 visit with Dr. Pierre-Louis, Ms. Martinez continued to complain of headaches and noise in her ears (R. 512). Dr. Pierre-Louis noted that Ms. Martinez had again stopped taking Elavil because she thought it was not working, but he encouraged her to restart the medication (R. 512-513). Dr. Pierre-Louis also stated that he would order an EEG in connection with Ms. Martinez's intermittent tinnitus (R. 513).

As noted above, Dr. Pierre-Louis referred Ms. Martinez to Dr. Clingerman for a neuropsychological evaluation. In his report, Dr. Clingerman noted that Ms. Martinez had been an honors student at Lane Tech before her aneurysm, but had dropped out due to her inability to retain information (R. 519). Dr. Clingerman noted that Ms. Martinez had seen a psychologist once or twice after her surgeries, but stopped because she could not afford to continue (R. 519). Dr. Clingerman also noted the effects Ms. Martinez's memory problem had on her daily living

4

(R. 518). He described how Ms. Martinez used post-it notes as reminders and repeated out loud the name of the object for which she was searching (R. 518).

Before issuing his report, Dr. Clingerman met with Ms. Martinez on several occasions (twice in August 2011 for a total of five hours; once in September 2011 for three hours; and once in October 2011) (R. 517-518). Dr. Clingerman conducted various tests, including intelligence and personality tests, and included the results of the various tests in his report (R. 517-518). Dr. Clingerman noted that Ms. Martinez was mildly to moderately impaired with respect to her ability to recall a list of words and was severely impaired with respect to her ability to recall items after twenty minutes had passed (R. 521). Dr. Clingerman explained that "[i]n a constellation of largely average and occasionally above average intellectual abilities, Ms. Martinez has numerous severe verbal memory and motor strength deficits . . . indicating Moderate Cognitive Disorder," along with depression (R. 522). Dr. Clingerman further opined that "the onset and timing of symptoms strongly indicates sequelae from the subarachnoid hemorrhage" (R. 523). He concluded that "aggressive treatment" of Ms. Martinez's psychiatric symptoms "is vital" and that Ms. Martinez "is disabled from obtaining and maintaining competitive employment" (R. 523).

Ms. Martinez continued to see Dr. Clingerman after he completed his neuropsychological evaluation. On January 11, 2012, Ms. Martinez told Dr. Clingerman she had stopped taking Elavil (R. 508). During appointments on March 7, 2012, April 13, 2012 and May 21, 2012, Ms. Martinez and Dr. Clingerman discussed primarily Ms. Martinez's depression and her trouble sleeping (R. 500, 503, 505). Ms. Martinez's other doctors also noted that she was depressed (R. 424, 433, 441, 539 (Dr. Herrera); R. 515 (Dr. Pierre-Louis)).

5

## C.

In addition to seeing her own treating physicians, Ms. Martinez also met with two consulting physicians to whom she was referred by the Illinois Bureau of Disability Determination Services (R. 457, 465). On July 12, 2011, Ms. Martinez met with Patricia M. Morrin ("Dr. Morrin"), a clinical psychologist, for 30 minutes (R. 458). Dr. Morrin recorded her observations and the answers Ms. Martinez gave to questions Dr. Morrin asked. Dr. Morrin noted that Ms. Martinez was accompanied to the appointment by her husband and daughter (R. 458). Dr. Morrin also noted Ms. Martinez's statement that she experienced headaches almost every day (R. 458).

Dr. Morrin diagnosed Ms. Martinez with "adjustment disorder with anxiety and depressed mood" (R. 462). As part of her conclusions, Dr. Morrin stated that Ms. Martinez had demonstrated "some difficulty with memory" (R. 462): while Ms. Martinez could repeat six digits forward and five backward, she could not remember yesterday's news, what she had for dinner or whether she had finished the 11th grade (R. 459, 460). Dr. Morrin also noted that if awarded benefits, Ms. Martinez "would have difficulty managing her finances" (R. 462).

The Bureau of Disability Determination Services also sent Ms. Martinez for an internal medicine consultation, which occurred on July 12, 2011 with Sujatha Neerukonda, M.D. ("Dr. Neerukonda") (R. 465). Dr. Neerukonda reported plaintiff's memory problems (including that she needs assistance to shop, take public transportation and cook and that she needs constant reminders for most activities, including taking medicine) and noted that her memory impairment makes her a poor historian (R. 465, 467). Dr. Neerukonda also noted Ms. Martinez's report to him that she could climb only four stairs before resting due to severe shortness of breath (R. 465). Ms. Martinez told Dr. Neerukonda about her severe headaches (for which she was taking

6

amitriptyline without relief) and stabbing pains in her chest (R. 466). In his report, Dr. Neerukonda described Ms. Martinez as having "significantly depressed" affect (R. 467). He listed the following as his "clinical impression" of Ms. Martinez's problems: hypertension; depression; cognitive impairment secondary to subarachnoid hemorrhage; status post right frontal craniotomy for aneurysm leak; status post dorsal thoracotomy for correction of coarctation of aorta; and cephalgia (headache), post traumatic (R. 467-468).

**D.**

The administrative record also contains several reports from consultants obtained at the request of the Bureau. All of these reports were based on record review, and without any in-person examination of Ms. Martinez.

The Bureau of Disability Determination asked Lionel Hudspeth, Psy. D ("Dr. Hudspeth") to fill out a document titled "Psychiatric Review Technique," which he did on or about July 23, 2011 (R. 474). Dr. Hudspeth determined that Ms. Martinez had a "not severe" impairment of "adjustment disorder" (R. 474, 477). Dr. Hudspeth did not note any memory impairment (R. 475). He did, however, note that Ms. Martinez had "mild" limitations with respect to "restriction of activities of daily living," "maintaining social functioning," and "maintaining concentration, persistence or pace" (R. 484). Dr. Hudspeth concluded, contrary to the opinion of Dr. Pierre-Louis, that "claimant's limitations are more likely related to physical issues rather than a severe limitations [sic] due to a mental disorder" (R. 486).

On or about July 26, 2011, James Hinchen ("Dr. Hinchen") conducted a physical residual functional capacity assessment (R. 488, 495). Aside from some basic lifting restrictions, Dr. Hinchen concluded that Ms. Martinez was limited to balancing only occasionally and to avoiding concentrated exposure to hazards, such as heights and machinery (R. 489, 490, 492). Dr.

7

Hinchen said the reason for the height restriction was that Ms. Martinez had had a craniotomy (in 1991, when doctors surgically repaired the aneurysm) (R. 492). Dr. Hinchen stated that "claimant's allegations are considered partially credible, physical condition should not limit [activities of daily living] as [claimant] alleges" (R. 495).

By August 1, 2011, the Social Security Administration had denied Ms. Martinez's claim (R. 74). Ms. Martinez requested reconsideration (R. 80). At that point, two doctors, Ernst Bone, MD ("Dr. Bone") and Glen Pittman, MD ("Dr. Pittman") reviewed Ms. Martinez's medical records, and they agreed with the denial (R. 496-498). On October 26, 2011, the Social Security Administration again denied Ms. Martinez's claim, stating that she was still capable of performing her prior work as a bill collector (R. 80, 83). Ms. Martinez requested a hearing before an Administrative Law Judge (R. 92).

### E.

On September 17, 2012, the ALJ conducted a hearing on plaintiff's claim. Plaintiff and her husband testified on plaintiff's behalf. In addition, the ALJ questioned a vocational expert.

Ms. Martinez testified that she had experienced headaches nearly every day since her aneurysm surgery (R. 46, 48). She testified that she often wakes up with a headache and falls asleep with a headache (R. 46). Ms. Martinez testified that she had a headache (although not a severe one) during the hearing and that her headaches sometimes lasted for days (R. 48). Ms. Martinez testified that her headaches are generally bearable but that they sometimes turn into migraine headaches (R. 46). Prior to 2011, Ms. Martinez treated her headaches by turning off the lights and resting; in 2011, she began taking amitriptyline (R. 46). Ms. Martinez temporarily stopped taking the drug (because she did not think it was working) until her doctor told her: (a) that she needed to continue taking it; and (b) that, eventually, it would help (R. 49).

8

Ms. Martinez also testified about her chest pain. Ms. Martinez testified that since her surgery, she sometimes feels "debilitating" chest pain (R. 50-51). Ms. Martinez fears that if the chest pain strikes at the wrong moment, she will fall and injure herself, which is why Ms. Martinez fears stairs and takes showers only while sitting down (R. 51).

Finally, Ms. Martinez testified about her memory problems. Ms. Martinez testified that she cannot remember such things as whether she showered or whether she gave her daughter medication, so she writes things down (R. 52-53). When she is looking for an item, Ms. Martinez repeats the name of the item out loud so she will not forget what she is looking for before she finds it (R. 57). Ms. Martinez testified that she does not use the stove (because she burned too many pans after forgetting about them) and does not go for walks alone (although she does walk with her husband for exercise) (R. 53, 54). In addition, Ms. Martinez stated that she can read the same book multiple times without knowing how it will end (R. 52).

In addition to asking about plaintiff's symptoms, the ALJ also asked Ms. Martinez why she had stopped working in 1998. Ms. Martinez answered, "My husband saw that I was working in pain and he said no. He said it's not worth it" (R. 45).

Plaintiff's husband also testified at the hearing. He testified that he helps his wife by cooking sometimes (R. 60). He also testified that he helps his wife by telling his daughter to do chores or sometimes by doing chores himself (R. 60).

Vocational Expert Carrie Seaver (the "VE") also testified at the hearing. The VE testified that plaintiff had previously held the position of bill collector, which the VE described as a semi-skilled, sedentary position (R. 63-64). The ALJ asked the VE the following questions and received the following answers:

> Q: I would like you to assume a young individual with a tenth grade education who shares the claimant's vocational background. [For]

9

> purposes of the first question, I would like you to assume an individual that's limited to light work meaning could only lift up to 20 pounds occasionally, lift or carry ten pounds frequently as light work is defined by the regulations. Never climb ladders, ropes or scaffolds and only occasionally balance. In addition the individual would need to avoid concentrated exposure to hazards like dangerous machinery or exposure to unprotected heights. In addition they would be limited to simple, routin[e] repetitive tasks but in a low stress job which I define as one that has only occasional changes in the work setting. Based on those limitations such an individual would not be able to perform the claimant's past work due to the skill level I assume, is that correct?
>
> A:   Correct.
>
> Q:   Would there be other jobs in the economy such a person could perform?
>
> A:   Yes.

(R. 64). The VE went on to testify that such a person could perform the jobs of hand packer, assembler and sorter, of which there are, respectively, 4700, 5600 and 2800 jobs available in the Chicago metropolitan area (R. 64-65). Next, the ALJ asked the VE whether a person with the same restrictions as above but with the added restriction of being off task 20 percent of the day could perform those jobs (R. 65). The VE said such an individual would not be able to perform any job (R. 65). The ALJ also asked whether an individual with the restrictions outlined in the first question but with the added restriction of needing to take breaks for a total of three to four hours per week could perform work (R. 65-66). The VE responded that "there would be no jobs" for such a person (R. 66).

### F.

Ten days after the hearing, on September 27, 2012, the ALJ issued an opinion in which he concluded that Ms. Martinez is not disabled within the meaning of the Social Security Act (R. 17-27). The ALJ followed the usual five-step analysis outlined in 20 C.F.R. §416.920(a)(4). At step one, the ALJ concluded that Ms. Martinez had not engaged in substantial gainful activity

since the date on which she applied for benefits (R. 19). At step two, the ALJ concluded that Ms. Martinez has several severe impairments, including "status post aneurysm with craniotomy, status post repair of coarctation of the aorta, headaches and depression" (R. 19). At step three, the ALJ concluded that Ms. Martinez does not have an impairment that meets or exceeds the listed impairments (R. 19). The ALJ then concluded that Ms. Martinez has the residual functional capacity to perform light-duty work that is limited to simple, routine, repetitive tasks in a low-stress environment which does not expose plaintiff to heights or machinery (R. 21). Based on that residual functional capacity, the ALJ concluded, at step four, that Ms. Martinez could not return to the work she had previously performed (R. 26). At step five, however, the ALJ determined that jobs within Ms. Martinez's restrictions are available in the local economy and, therefore, that Ms. Martinez is not disabled (R. 26-27).

## II.

Where, as here, the Appeals Council denies review, the ALJ's ruling is the Social Security Commissioner's final decision. 20 C.F.R. § 404.981; *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). We reverse the decision of the ALJ only if it is not supported by substantial evidence, which means evidence that "a reasonable mind might accept as adequate to support a conclusion." *Minnick*, 775 F.3d at 935. In doing so, we will not reweigh evidence or substitute our own judgment for that of the ALJ. *Minnick*, 775 F.3d at 935. Rather, what we are looking for is a "logical bridge" that shows how the record evidence leads to the conclusion. *Minnick*, 775 F.3d at 935. In addition, we defer to the credibility determination of the ALJ (who has met the claimant) unless the credibility finding is "patently wrong." *Engstrand v. Colvin*, __ F.3d __, __, 2015 WL 3505585, *4 (7th Cir. June 4, 2015). A credibility finding is patently wrong when

11

the reasons "are contradicted by the objective evidence." *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008).

In this case, plaintiff argues that the matter should be remanded for two reasons. *First*, plaintiff argues that the ALJ failed to account for plaintiff's headaches when he determined plaintiff's residual functional capacity ("RFC"). *Second*, plaintiff objects to the ALJ's credibility determination. We consider these arguments in turn.

### A.

Plaintiff argues that, in determining her RFC, the ALJ failed to account for her headaches. Specifically, plaintiff points out that the ALJ determined that plaintiff has four severe impairments, one of which is headaches (R. 19). When the ALJ determined plaintiff's RFC, he included a restriction "to avoid workplace hazards and unprotected heights" and he connected the restriction to plaintiff's headaches by explaining that "[t]he limitation to avoid workplace hazards and unprotected heights is supported by giving the benefit of the doubt to the claimant's subjective allegations and the examinations and treatment of her neurologist, already discussed, who noted generally normal examination and test results, but some difficulty with headaches" (R. 25). Plaintiff argues that this restriction does not account for the effect of her headaches on her ability to work.

We have no quarrel with the ALJ's inclusion of a hazards and height restriction as it reasonably addresses the evidence that unpredictable instances of chest pain may cause Ms. Martinez to become unsteady and fall. But we agree that this restriction does not adequately account for the evidence of plaintiff's headaches and their effects. We note that in his physical RFC assessment, Dr. Hinchen concluded that plaintiff should "avoid concentrated exposure" to hazards such as "heights" not because of headaches, but "due to craniotomy" (R. 492): that is,

12

because plaintiff, at the age of sixteen, had had a piece of her skull removed so that doctors could repair the aneurysm.

Having found that plaintiff's headaches are a severe impairment, the ALJ was required to account for them in his RFC. *Craft*, 539 F.3d at 676 ("When determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'") (citing 20 C.F.R. § 404.1545(a)(2), (b), (c)). Defendant argues that the ALJ sufficiently did so. For two reasons, we disagree.

*First*, the ALJ discounted the migraine headaches because plaintiff had not always complied with her prescribed medication (R. 22). The regulations provide that if a claimant does not "follow the prescribed treatment *without a good reason*, we will not find you disabled." 20 C.F.R. § 416.930(b) (emphasis added). The ALJ was correct that Ms. Martinez had, for a time, failed to take the drug her doctor prescribed for migraines, but the ALJ failed to adequately address why plaintiff failed to do so: she was concerned about the efficacy of the medication until her doctor explained that she needed to take it for some period of time before it would work (R. 49, 512-513, 528). Moreover, by the date of the hearing, at the urging of Dr. Pierre-Louis, plaintiff had been taking amitriptyline and acknowledged that it was helping (R. 46). But, the ALJ did not sufficiently address the extent to which use of the medication reduced the incidence of severe headaches that Ms. Martinez experienced.

*Second*, in minimizing the effect of Ms. Martinez's headaches, the ALJ gave "slight weight" to what he described as plaintiff's "lack of discomfort during the hearing" (R. 22). The ALJ's perception (that plaintiff could carry on at the hearing even with a headache) was consistent with plaintiff's own testimony that, most of time, she could handle her headaches (R. 48). But, plaintiff also testified that it was when her headaches worsened that she needed to

13

retreat and avoid light and noise (R. 48). The ALJ did not explain why Ms. Martinez's ability to function at a hearing for 45 minutes was a reasonable barometer of her ability to function as a full-time employee if incidences of severe headaches occurred, or why her conduct at the hearing spoke to whether she experiences severe headaches.

Finally, inasmuch as we remand for the reasons given above, we also note that the ALJ (as well as the parties in their briefs) did not address whether the RFC adequately accounts for Ms. Martinez's well-documented memory problems. Not only did she testify to those problems (R. 52-54, 57), but they were noted by her treaters, including Dr. Clingerman, after extensive testing (R. 517-523). The agency examiner, Dr. Morrin, also examined plaintiff and concluded she had "some difficulty with memory" (R. 462). To the extent that the ALJ concluded plaintiff did not have memory problems, he was required to explain why he rejected the findings of both Ms. Martinez's treating neurologist and an agency examiner who met with plaintiff in favor of a conclusion (that she had no memory impairment) by an agency examiner (Dr. Hudspeth) who did not meet plaintiff. *Engstrand*, __ F.3d at __, 2015 WL 3505585 at *6 ("As the treating physician, Dr. Retzinger's opinion should have controlled over the conclusions of the agency doctor who did not examine [plaintiff], unless the ALJ could persuasively explain why Dr. Retzinger's opinions about [plaintiff's] serious limitations were not supported by the record"). (citing 20 C.F.R. § 404.1527(c)). On remand, the ALJ should address this issue.

**B.**

Plaintiff also argues that the case should be remanded because the ALJ erred in assessing the plaintiff's credibility. Because the ALJ witnessed the plaintiff's testimony (while we have only a record to review), we accept the ALJ's credibility assessment unless it is patently wrong,

14

which is to say contrary to objective evidence. *Engstrand*, __ F.3d at __, 2015 WL 3505585 at *4; *Craft v. Astrue*, 539 F.3d at 680.

Plaintiff objects to the ALJ's credibility finding, because the ALJ included in his decision boiler-plate language of which the Seventh Circuit Court of Appeals is suspicious. Specifically, the ALJ stated, "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 22). By itself, the boilerplate language is an insufficient explanation of the ALJ's reasoning (*see Minnick v. Colvin*, 775 F.3d at 936), but the inclusion of the language does not automatically invalidate a credibility determination. The question is whether the ALJ has offered reasons to explain his credibility conclusion, and whether the reasons are supported by the evidence.

Here, the ALJ offered several reasons for his credibility determination, two of which we have already touched on. The ALJ stated that plaintiff stopped taking her headache medication, which suggested to the ALJ that plaintiff's headaches must not be as bad as she described (R. 22). As we have discussed, the ALJ did not sufficiently explore the reasons for Ms. Martinez's lapses from taking medication or the effectiveness of the medication once she began taking it regularly. The ALJ also cited Ms. Martinez's ability to function during the hearing, but, as we explained, the ALJ did not explain why that undermined her complaints about severe headaches and their effect.

The ALJ noted that Ms. Martinez had not received the type of medical attention he might have expected if her problems were as severe as she made them out to be (R. 22). In particular, the ALJ noted that plaintiff "sought no treatment from a neurologist or psychologist until 2011" (R. 22). This is contrary to the evidence. The record contains evidence that plaintiff saw a

15

psychologist after her brain surgery and that she did not continue, because she could not afford to (R. 519). Moreover, beginning in 2011 (which is her alleged onset date), Ms. Martinez consistently sought treatment from Drs. Pierre-Louis and Clingerman (R. 448, 452, 500, 503, 505, 508, 512, 515, 517-518).

Finally, the ALJ concluded that plaintiff's daily activities were not as limited as he would have expected given her complaints (R. 22). The ALJ cited the fact that Ms. Martinez had eloped in 1997, had given birth to a child and had attended one doctor's appointment on her own (on March 8, 2011), despite testifying that she did not like to leave her house alone (R. 22). The ALJ did not explain why these activities render less than credible Ms. Martinez's complaints about being incapacitated by frequent severe headaches. On its face, getting married, having a child and attending one (of many) doctor's appointments on her own are not inconsistent with a claim that frequent severe headaches render her incapable of sustaining full-time employment. On remand, the ALJ will have the opportunity to consider and address these points.

## Conclusion

For the reasons stated above, we grant plaintiff's request for remand (doc. # 10) and deny defendant's motion for summary judgment (doc. # 20). This case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: July 2, 2015

16